[Civ. No. 4654. First Appellate District, Division One.—January 14, 1924.]

## HERMAN R. HEWELCKE, Respondent, v. CARROLL SHIPMAN, Appellant.

[1] MALICIOUS PROSECUTION—PROBABLE CAUSE.—In malicious prosecution cases, probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.

[2] ID.—BURDEN OF PROOF.—In an action for damages for malicious prosecution, the burden of proving want of probable cause rests upon the plaintiff.

[3] ID.—GOOD FAITH—ADVICE OF COUNSEL—PROBABLE CAUSE—EVIDENCE.—In this action for damages for malicious prosecution, the defendant having twice caused the arrest of plaintiff, the first time upon a charge of embezzlement and the second time upon a charge of grand larceny, and each time the charge being dismissed, the evidence showed that defendant had an honest belief in plaintiff's guilt, that he was justified as a reasonable man in such belief, that he had laid the facts of the case fully and fairly before counsel, and that he acted in good faith upon the opinion given him by counsel, and there was no evidence whatever to show bad faith in defendant.

[4] ID.—UNDISPUTED FACTS—DUTY OF TRIAL COURT.—In such action, there having been no dispute concerning the facts relied upon to show probable cause, and the advice of counsel not having been based upon any false statement of fact, the question of probable cause was one of law and should have been determined by the trial court and should never have been submitted to the jury for its verdict unless, under proper instructions of the court, to find in favor of defendant.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. E. P. Shortall, Judge. Reversed.

The facts are stated in the opinion of the court.

1. Probable cause for making arrest in action for malicious prosecution, notes, 26 Am. St. Rep. 138; 42 L. R. A. (N. S.) 75.

2. Advice of counsel as defense to action for malicious prosecution, notes, 1 Ann. Cas. 932; 11 Ann. Cas. 954; Ann. Cas. 1912D, 423.

O'Gara & De Martini for Appellant.

Harry I. Stafford for Respondent.

ST. SURE, J.—This is an action to recover damages for malicious prosecution. Trial was had by jury, which gave plaintiff a verdict for fifteen hundred dollars, upon which judgment was entered. Defendant appeals from the judgment and also from an order denying his motion for a new trial.

Defendant claims, in support of this appeal, that the evidence is insufficient that he instituted a criminal action without probable cause. [1] Probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true (*Potter* v. *Seale*, 8 Cal. 221). It is necessary to chronologically narrate the facts contained in the record, in order to show the situation of the parties and the circumstances of their business relationship preceding and up to the trouble which resulted in this litigation.

Plaintiff Hewelcke is a public accountant. Defendant Shipman, for a number of years prior to April 20, 1920, had been the exclusive sales agent for the Automatic Refrigerating Company of Hartford, Connecticut, of which I. K. Hamilton, Jr., and M. F. Owens were at all times respectively president and secretary. The business of the corporation is the erection of refrigerating plants and the manufacture and sale of refrigerating equipments, appliances, and materials. Shipman resigned said agency on April 20th. For several years Shipman held a lease of rooms in the Holbrook Building, where he transacted business on behalf of the Automatic Refrigerating Company. On May 1, 1920, the business of the Automatic Refrigerating Company, its books and property, were removed from the Holbrook Building to new offices in the Hearst Building.

By the terms of his contract with the Automatic Refrigerating Company, Shipman was entitled to a salary of fifteen hundred dollars a year, payable in weekly installments, and was also entitled to an allowance for rent and for clerical hire. In addition, Shipman was entitled to a commission of three and one-third per cent of all contracts which were closed through his office. In case the volume of contracts

turned in by him during any calendar year equaled or exceeded ten per cent of the amount of his salary and expenses, then he was entitled to a bonus in an amount equal to ten per cent of the total contracts closed through his office during the year, less his salary, traveling expenses, office expenses, and the three and one-third per cent commission. In 1917 he was allowed an additional salary of three dollars per day for time which he might give in superintending construction work. It was the practice between Shipman and the Automatic Refrigerating Company for an accounting to be made by the company following the first day of January and the first day of July of each year. Usually two or three months passed before Shipman received his commission earned during the preceding six months. At the time when he ceased to act for the company, on April 20, 1920, the company had not accounted to him for his commission earned since July 1, 1919. The Automatic Refrigerating Company had a thoroughly organized accounting system at its principal place of business in Hartford, Connecticut. Shipman was not required to, and did not, keep a regular set of books. He made weekly reports to the company, showing, for example, his salary earned or expenses paid out, which were utilized by the company in making up its books of account. He kept for his own protection a carbon copy of each report, using a printed form supplied by the company. In due time the company sent to Shipman a check drawn on a Hartford bank and payable to the order of Carroll Shipman, for the account of his salary or his expenses or both, as previously reported in the weekly statement. Attached to such check was a so-called "check voucher," upon which was printed: "The attached check is in full payment of items listed below a copy of which is retained in this office. No receipt is necessary. In case of error return without detaching check. Detach before depositing check." These "check vouchers" were regularly detached and retained by Shipman. For the conduct of his personal and business affairs Shipman opened three separate accounts at the First National Bank of San Francisco. The first was under the name of "Carroll Shipman," the second was designated "Carroll Shipman, San Francisco Manager of the Automatic Refrigerating Company," and the third "Carroll Shipman, Special." The records of Shipman's

office, which Shipman claimed were stolen by Hewelcke, comprised carbon copies of the weekly reports, "check vouchers," bank statements, canceled checks, and the corresponding check-book stubs.

Following his resignation Shipman commenced doing business on behalf of the American Ice Machine Company, a corporation organized by himself. This new concern engaged in the same line of business that he had previously transacted for the Automatic Refrigerating Company.

About April 25, 1920, Shipman employed plaintiff Hewelcke, the accountant, to examine the records of his office and to report to him as to the condition of his affairs, with special reference to certain irregularities alleged to have been committed by a man named Shafer, a former employee of Shipman. Hewelcke conducted his examination of said records at the rooms in the Holbrook Building, made his report to Shipman, and was paid for his services by Shipman about the 7th of May, 1920.

Soon after completing said audit for Shipman, Hewelcke was employed by Shipman to act as bookkeeper for the American Ice Machine Company and other concerns in which Shipman was interested. By the terms of this second employment Hewelcke was at liberty to do the work at his own convenience provided he kept the work up to date. Hewelcke entered upon said employment and was supposed to work in pursuance thereof up to the twenty-eighth day of July, 1920.

Hewelcke, while in the employ of Shipman as aforesaid, met Owens, secretary and general manager of the Automatic Refrigerating Company, at the office of Shipman. Later Owens employed Hewelcke to examine the records in Shipman's office. Owens called on Shipman and expressed a desire to have an audit made. This was agreeable to Shipman and he consented. Subsequently, Hewelcke, who was not present at the conversation with Owens, called on Shipman, stated that Owens had employed him to make an audit, and arranged to see the records. Shipman told him to go ahead and examine them, which Hewelcke proceeded to do.

Up to this time the records were in Shipman's office, under his exclusive control, and no one had questioned his ownership or right to possession of them.

Hewelcke removed the records from Shipman's office to his own office in another building. Shipman testified that he did not consent to the taking of any of the records from his office. Hewelcke testified that Shipman did consent to the taking of the records to Hewelcke's office. But Hewelcke further testified that when he removed the papers to his own office he intended to return them to Shipman's office when the examination was finished.

It is undisputed that on a day shortly prior to July 28, 1920, Shipman telephoned Hewelcke and asked him if he, Hewelcke, had his, Shipman's, records. It is admitted that Hewelcke then replied that he did have the records. Shipman testifies that he then demanded the return of the records, which Hewelcke denies.

After he had made the audit for the Automatic Refrigerating Company Hewelcke made a report to its president, Mr. Hamilton. He next saw Shipman in the latter's office on July 28th. Shipman asked Hewelcke if he had completed his report, and Hewelcke informed him that he had, and Shipman then asked where the records were, and Hewelcke told him they were in the office of Mr. Hatch, an attorney for the Automatic Refrigerating Company. Shipman became very angry and Hewelcke says there followed an outburst of language he did not care to repeat. In describing the incident Shipman said: "Of course I was angry. I was as angry as I could be. I don't think I was so angry in my life before. The whole thing I had, all my books and everything else, had been taken. The Automatic Refrigerating Company could frame up anything they wanted to on me, and not having any proof against them—I was angry."

Shipman hastened to the office of his friend and counselor, Colonel Neal Power, attorney at law. After hearing Shipman's story Power telephoned to Attorney Hatch's office, demanding the return of Shipman's records, and his demand was refused. Power advised Shipman that Hewelcke had committed a crime, either embezzlement or grand larceny, and that he, Shipman, should consult the district attorney as to the proper charge. Power gave Shipman a letter of introduction to District Attorney Brady, but Shipman went instead to the office of the bond and warrant clerk. Skillin, an attorney, and an assistant of the bond and warrant clerk,

issued a citation. In answer Hewelcke appeared, and Skillin heard the statements of both Shipman and Hewelcke. Skillin told Hewelcke to return the records to Shipman. Hewelcke telephoned to Hatch and then reported that Hatch would not return the records. Skillin announced that a warrant would be applied for, and at once prepared a complaint charging Hewelcke with embezzlement as the agent of Shipman. By the advice of Skillin Shipman swore to this complaint. The embezzlement charge was heard by Police Judge Sullivan and promptly dismissed.

The hearing before Judge Sullivan was summary, and Shipman reported to Power that the case had not been fully presented. In this report Shipman was supported by J. C. Flannery, a duly licensed attorney associated with Power, who was present at the hearing. Power advised Shipman that Hewelcke had committed a crime, and told him to see the district attorney in person. Power wrote a second letter to District Attorney Brady, which Shipman delivered. Thereupon Brady heard Shipman's statement of the case and also called on Heidelberg, the assistant who presented the case before Judge Sullivan, for his statement. After hearing Heidelberg's statement the district attorney stated to Shipman that in his opinion Hewelcke was guilty of grand larceny, and told him to sign a new complaint charging grand larceny. This Shipman did at once, the new complaint being prepared upon Brady's instructions personally given. It is this second complaint which is the basis of this action.

Power testified and Brady testified for defendant Shipman at the trial. Each of them was certain of the result of Shipman's statement, and as to the advice given him as stated herein. Besides being advised with respect to the grand larceny charge by Power and the district attorney, Shipman was also advised by J. C. Flannery, a duly licensed attorney associated with Power. Flannery testified for defendant Shipman and showed affirmatively that Shipman made a full and fair statement of the facts of the case to him and that he also advised Shipman that in his opinion Hewelcke was guilty of grand larceny.

The complaint sworn to by Shipman charged Hewelcke with the commission of the crime of grand larceny for that he did steal, take, and carry away certain canceled checks,

check-book stubs, bank statements, "check vouchers," and copies of weekly statements, the property of Shipman. The value of the property was alleged to be six thousand dollars. The warrant issued and Hewelcke was arrested and kept in prison for an hour. After the hearing Police Judge McAtee dismissed the case. This action resulted.

The only issues raised by the pleadings herein are on the subject of want of probable cause, the existence of malice, and the infliction of damages.

From the story told by the record it appears that all was serene between Hewelcke and Shipman up to July 28th. Indeed, Hewelcke was at that time in Shipman's employ. Shipman was willing that there should be an examination of his records by Hewelcke for the Automatic Refrigerating Company. There is a dispute between Shipman and Hewelcke as to whether or not the records were removed by Hewelcke to his office with or without Shipman's consent. But there is no dispute that Shipman demanded the return of his records of Hewelcke on July 28th. Here is what witness Hewelcke says about such demand:

"Q. (Mr. Stafford.) Tell us what you said to him and what he said to you, especially with reference to the telegram, if anything was said with reference to it." (Upon receipt of Hewelcke's report Hamilton, president of the Automatic Refrigerating Company, had wired witness to turn the records over to Hatch, the attorney for the company.) "A. He asked me whether I had completed the report, and I said that I had completed the report and that the same had been forwarded to Mr. Hamilton in Hartford, Connecticut, and he asked me where the records were. I told him (Shipman) I had turned them over to Mr. Hatch, the attorney for the Automatic Refrigerating Company. He says: 'Under what authority?' I says: 'On the telegram I had received from Mr. Hamilton,' and then I showed him the telegram. He says: 'I don't give a damn what that telegram says, or anything; those are my records, and you had no right to turn them over to anybody but me.'"

These were the records for the larceny of which plaintiff was arrested. These records included twenty-nine statements issued by the First National Bank for "Carroll Shipman, Special," the first being of date December 31, 1917,

and the last dated April 20, 1920; also twenty-nine bank statements issued by the same bank to "Carroll Shipman for account S. F. Manager of the Automatic Refrigerating Company," covering the same dates. Also bank checks consisting of 1106 bank checks in the name of "Carroll Shipman, Special"; 1383 canceled checks, "Carroll Shipman, S. F. Manager Automatic Refrigerating Company"; four books of check-book stubs for the account of "Carroll Shipman, Special"; five books of check-book stubs for the account of "Carroll Shipman, S. F. Manager Automatic Refrigerating Company"; also "check vouchers" or statements covering a period for office expenses from September 1, 1914, to April 30, 1920, and also separate statements covering construction expenses for the same period, and, finally, carbon copies of weekly statements divided into three different classes, one of expense account entered "Carroll Shipman, S. F. office," from September 14, 1910, to April 20, 1920; the second entitled "Expense account Carroll Shipman, Personal," for the same period, and the third of said expense accounts entitled "Carroll Shipman, Construction," for the period from December 1, 1913, to April 30, 1920. These records taken by Hewelcke constituted Shipman's only books of account; and they were necessary for his protection in order to establish his claims against the Automatic Refrigerating Company and others, and to resist any false claims which might be made against him by the Automatic Refrigerating Company or any other person. It was no part of Shipman's duties to collect money for the Automatic Refrigerating Company, and he never did collect any money for the company.

It is suggested that these records were of little or no value. When witness Shipman was asked how he fixed the value of them at six thousand dollars, he replied that he had at that time a claim against the Automatic Refrigerating Company which was afterward settled with him for fifteen hundred dollars; that he had at that time a claim against the First National Bank which was afterward settled for fifteen hundred dollars; and that he has a claim against one Burgess for three thousand five hundred dollars; that "there is an argument about some of the items that might reduce it to three thousand dollars." There is no denial of this testimony. Even if there was, we cannot see that the

intrinsic or market value of the records would make any difference. They were certainly of great value to Shipman, consisting, as they did, of the only records he had of his financial business transactions covering a period of years.

We agree with counsel for plaintiff that the only question involved in this appeal is whether the defendant Shipman, in making the complaint against plaintiff Hewelcke, acted maliciously and without probable cause. **[2]** The burden of proving want of probable cause rests upon the plaintiff. (*Potter* v. *Seale*, 8 Cal. 217, 221; *Grant* v. *Moore*, 29 Cal. 644; *Levy* v. *Brannan*, 39 Cal. 485; *Anderson* v. *Coleman*, 53 Cal. 188; *Jones* v. *Jones*, 71 Cal. 89 [11 Pac. 817]; *Lacey* v. *Porter*, 103 Cal. 597 [37 Pac. 635]; *Davis* v. *Pacific Telephone Co.*, 127 Cal. 313 [57 Pac. 764, 59 Pac. 698]; *McKenna* v. *Heinlen*, 128 Cal. 97 [60 Pac. 668]; *Lee* v. *Levison*, 173 Cal. 166 [159 Pac. 438]; *Jirku* v. *Brod*, 42 Cal. App. 796 [184 Pac. 413]; *Squires* v. *Southern Pac. Co.*, 42 Cal. App. 459 [183 Pac. 695].) **[3]** Plaintiff Hewelcke argues that the evidence shows malice by defendant Shipman against him, because when Shipman demanded the return of his records he became very angry with him, called him vile names, threatened him with arrest, and later had him arrested. Shipman admits that he was angry, but denies the use of vile language. Considering all of the circumstances we think that an outburst of passion on Shipman's part was perfectly natural. The evidence shows that he had as an excuse for his anger an honest belief that he had been grievously wronged by Hewelcke in being deprived by him of his property. This belief was not founded upon mere suspicion but upon his actual knowledge that Hewelcke had taken and retained his property. Shipman had an honest belief in Hewelcke's guilt, and the undisputed evidence shows that he was justified as a reasonable man in such belief. In addition the evidence shows that Shipman laid the facts of his case fully and fairly before counsel, and that he acted in good faith upon the opinion given him by counsel. There is no evidence whatever to show bad faith in defendant Shipman.

Our conclusion, based upon the evidence adduced at the trial and the law applicable thereto, is that there was probable cause for the arrest of plaintiff Hewelcke. We have read every California case upon the subject of malicious

prosecution, from *Potter* v. *Seale, supra,* to and including the recent decision of our supreme court in *Franzen* v. *Shenk,* 192 Cal. 572 [221 Pac. 932], and we think our view is supported by the authorities. The Franzen case was an action to recover damages for the malicious prosecution of a proceeding wherein, by affidavit filed by the defendant before a justice of the peace, the plaintiff was charged with being an insane person. The supreme court pointed out that there was "manifestly a conflict in the evidence relating to the facts from which the existence or want of probable cause for the prosecution of the insanity proceeding must be determined." [4] In the case before us there is no dispute concerning the facts relied upon to show probable cause, nor was advice of counsel based upon any false statement of fact. Here the question presented by the evidence was one of law and should have been determined by the court. The case, upon the evidence, should never have been submitted to the jury for its verdict unless, under proper instructions of the court, to find in favor of the defendant.

The judgment is reversed.

Tyler, P. J., and Needham, J., *pro tem.,* concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 14, 1924.