[Civ. No. 24193. Third Dist. Apr. 1, 1986.]

DANIEL A. WILLIAMS, Plaintiff and Appellant, v.
JAMES R. COOMBS, Defendant and Respondent.

628

**COUNSEL**

O'Connor, Cohn, Dillon & Barr and Lisa T. Ungerer for Plaintiff and Appellant.

Steven A. Lewis and Lewis & Kimball for Defendant and Respondent.

## OPINION

**SPARKS, J.**—The trial court granted a motion for summary judgment in favor of Attorney James R. Coombs, the defendant in this action for malicious prosecution and intentional infliction of emotional distress. Dr. Daniel A. Williams, the plaintiff below, appeals from the order and judgment, claiming there are triable issues of material fact in his first cause of action for malicious prosecution and denying that a statutory privilege defeats his second cause of action for intentional infliction of emotional distress. Granting him half his loaf, we reverse the judgment and reinstate his first cause of action while affirming the trial court on the second.

### FACTS

Only a brief recitation of the underlying facts are necessary to understand this appeal. On March 26, 1980, Wilma Bube was placed in Siskiyou General Hospital by officers of the Yreka Police Department for a 72-hour evaluation under Welfare and Institutions Code section 5150 because she had made suicidal gestures with a revolver.[1] While the emergency room physician examined her, Dr. Daniel Williams (her personal doctor) came upon the scene and recommended that she be put in a private room rather than the locked room the hospital kept for patients in a delusional state or otherwise in danger of hurting themselves. Mrs. Bube was then placed in a regular hospital room. That same night she hanged herself by the belt of her robe from the sprinkler system.

On April 27, 1981, the decedent's daughter, Karleen Rhey, engaged the defendant to represent her. On June 15, 1981, the defendant filed a wrongful death action on her behalf against Dr. Williams and the hospital. A jury found for Dr. Williams and the hospital. A motion by Mr. Coombs for a new trial was granted with respect to the hospital but denied as to Dr. Williams. Dr. Williams then commenced the present action against Attorney James R. Coombs and his client, Karleen Rhey.[2] Defendant Coombs there-

---

[1]Welfare and Institutions Code section 5150 provides in relevant part: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."

[2]Defendant Karleen Rhey did not move for summary judgment and consequently is not a party to this appeal.

after moved for summary judgment. The trial court granted the motion as to the malicious prosecution count on the grounds that "as a matter of law defendant Coombs acted with probable cause in instituting and prosecuting the underlying medical malpractice action against plaintiff Williams through final judgment, and there is no triable issue as to any material fact relating to probable cause." The court granted the motion as to the second cause of action for intentional infliction of emotional distress on the ground that it "fails because of the absolute privilege set forth in Civil Code § 47, subdivision 2." This appeal followed.

DISCUSSION

I

Dr. Williams' first cause of action is for malicious prosecution. "To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878], citations omitted.) In such an action, the plaintiff must also establish that the action caused "damage by way of attorney's fees incurred in defense, mental distress, and/or injury to reputation or social standing." (*Harbor Insurance Co.* v. *Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1036 [211 Cal.Rptr. 902].)

Defendant filed a motion for summary judgment claiming that he acted with probable cause and that there was not triable issue of material fact relating to that issue. In support of his motion, defendant filed a statement of facts he contended were undisputed. (See Code Civ. Proc., § 437c, subd. (b).) In response to that statement, Dr. Williams agreed that he saw Mrs. Bube in the Siskiyou General Hospital emergency room and had a brief conversation with her. Mrs. Bube told him she was drunk and wanted to be left alone. Dr. Williams further agreed that he requested that the emergency room physician write "routine admission orders" for Mrs. Bube and that he suggested that Mrs. Bube be put in a private room rather than the locked ward.

Defendant also supported his motion by his own declaration. There he asserted: "On or about April 27, 1981, KARLEEN RHEY spoke with me about filing a Wrongful Death Action, as a result of her mother's death. After discussing the case with Mrs. RHEY, I requested a week to review the matter. In early May, 1981, and after reviewing the matter in more detail,

I advised Mrs. RHEY that I felt there was a tenable claim of malpractice against the hospital and the physician because of their failure to place her mother in the locked ward for psychiatric patients. [¶] Before filing the complaint in the Wrongful Death Action, I learned from Mrs. RHEY that her mother had been placed in a private room, rather than the locked ward for psychiatric patients, and that Dr. WILLIAMS had made the decision to do that. [¶] Before filing the complaint in the Wrongful Death Action, I formulated an opinion that Dr. WILLIAMS' conduct in placing Mrs. BUBE into a private room, rather than the locked ward, violated the provisions of 22 Cal. Admin. Code § 70577(c), and therefore constituted *negligence per se;* at that time, I was unable to locate any authority interpreting § 70577(c).[3] [¶] Before filing the complaint in the Wrongful Death Action, I formulated an opinion that the matters regarding Mrs. BUBE's admission could be considered within the common knowledge of a lay jury, so that expert testimony would not be necessary. . . . [¶] I instituted and pursued the Wrongful Death Action against SISKIYOU GENERAL HOSPITAL and DANIEL WILLIAMS in the good faith and honest belief that my client's claim was tenable." ■ ■■ ■ (Capitalization in original.)[4]

In opposition to the motion, Dr. Williams claimed that both the facts surrounding defendant's investigation and the probable cause to sue him were disputed.[5] In support of his position Dr. Williams filed the declaration of three attorneys. First, Lisa Ungerer, counsel for Dr. Williams in the malpractice action, declared that she took defendant's deposition in March 1984. In that deposition defendant testified that he contacted Dr. William Keenan prior to filing the malpractice suit and Dr. Keenan expressed the opinion that the hospital was negligent in its care and treatment of Mrs.

---

[3]Section 70577, subdivision (c) of Title 22 of the California Administrative Code reads: "The psychiatric unit shall be used for patients with the diagnosis of a mental disorder requiring hospital care. For purposes of these regulations 'mental disorder' is defined as any psychiatric illness or disease, whether functional or of organic origin."

[4]The remainder of the documents in support of defendant's motion relate to events which occurred after the undertaking of the malpractice suit. Contrary to the belief of the defendant in this case, the facts to be analyzed for probable cause are those known to the defendant at the time the underlying action was filed. (*Lerner* v. *Glickfeld* (1960) 187 Cal.App.2d 514, 525 [9 Cal.Rptr. 686].) This is because the tort arises at the commencement (without probable cause) of the previous suit; maintenance of the suit thereafter simply serves to aggravate damages. (*Harbor Insurance,* 165 Cal.App.3d at pp. 1036-1037.) Further, a litigant cannot be permitted to file a suit based merely on a wing and a prayer and then be retroactively justified by some serendipitous discovery, unless of course the belatedly discovered facts are sufficient to convince a jury to decide the case in his favor. (See Rest.2d Torts, § 662, com. f.)

[5]The claimed factual dispute about defendant's investigation relates to what counsel for Dr. Williams describes as defendant's "poor to conflicting memory" in his deposition about the extent of his investigation. There is, however, no dispute about the material facts of defendant's investigation and thus "no triable issue as to any material fact" exists concerning that investigation. (Code Civ. Proc., § 437c, subd. (c).)

Bube. No mention of any negligence on the part of Dr. Williams was made by Dr. Keenan. This conversation may have occurred on the golf course and without furnishing Dr. Keenan with any documentary records. Indeed, defendant conceded that he consulted with Dr. Keenan only as a pathologist and not as a medical expert on the question of Dr. Williams' possible malpractice. Defendant admitted that he did not consult with a psychiatrist or any other physician prior to filing the malpractice suit. He also admitted that prior to filing the lawsuit he had not talked with any personnel at the hospital about the death of Mrs. Bube or with any member of the police department. He stated he perceived the legal issue as turning on the propriety of admitting a person under Welfare and Institutions Code section 5150 and then not treating that person as a psychiatric patient. His research consisted of Shepardizing that section and locating the cited administrative code section. He concededly found no cases construing the administrative provision in question.

In another declaration, Lawrence Kern, a specialist in personal injury cases, stated that, in his opinion, "based on the nature of the investigation and the review of the law conducted, the Rhey suit was not tenable against Dr. Williams from the outset, either on the issue of medical negligence or negligence per se." His opinion was based, in part, on the fact that prior to filing the suit defendant had never been advised by a medical doctor that Dr. Williams committed malpractice; that defendant never consulted a physician to determine whether Mrs. Bube should have been placed in a locked ward; that it is apparent from reading the Administrative Code section that it was intended to apply only to the licensing requirements for hospitals; and that, without any case authority, defendant assumed the Administrative Code provision was sufficient to bind a physician and render him liable in medical malpractice action. The third declarant, Attorney Douglas H. Newlan, opined that it was his "legal opinion that, based upon my review of the file and upon my knowledge of the case, Dr. Williams was sued by Mr. Coombs without probable cause and without a proper investigation into the case by Mr. Coombs."

Finally Dr. Williams attached portions of the deposition of Dr. William Keenan taken on May 24, 1982. There Dr. Keenan said he had some criticism of Dr. Williams but that his conduct did not constitute malpractice.

We begin our analysis of these declarations by reciting the familiar rules governing summary judgments: "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. [¶] 'The moving party bears the burden of

furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' 'The affidavits of the moving party are strictly construed and those of his opponent [are] liberally construed, and doubts as to the propreity of summary judgment should be resolved against granting the motion.'" (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134]; citations omitted.)

■ Thus in a malicious prosecution case, as with other cases, "the moving party has the burden of proving the absence of any triable issue of fact even though the burden of proof as to the particular issue may rest with the resisting party at the trial." (*Lucchesi* v. *Giannini & Uniack* (1984) 158 Cal.App.3d 777, 782 [205 Cal.Rptr. 62].) But "where there is no material issue of fact to be tried and the sole question before the trial court is one of law as to whether the claim of the moving party is tenable on the undisputed facts, it is the duty of the trial court on a motion for summary judgment to hear and determine the issue of law." (*Pittman* v. *Pedro Petroleum Corp.* (1974) 42 Cal.App.3d 859, 862 [117 Cal.Rptr. 220].) It is against this legal backdrop that we examine the question of probable cause.

■ For purposes of malicious prosecution, probable cause has historically been defined as a "suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." (*Potter* v. *Seale* (1857) 8 Cal. 217, 221; accord *McAfee* v. *Los Angeles Gas etc. Corp.* (1932) 215 Cal. 219, 223 [9 P.2d 212]; *Davis* v. *Local Union No. 11, Internat. etc. of Elec. Workers* (1971) 16 Cal.App.3d 686, 692 [94 Cal.Rptr. 562]; *Kassan* v. *Bledsoe* (1967) 252 Cal.App.2d 810, 817 [60 Cal.Rptr. 799].) In both civil and criminal prosecutions, it "has been further defined to be an honest suspicion or belief on the part of the instigator thereof, founded upon facts sufficiently strong to warrant the average person in believing the charge to be true." (*Murdock* v. *Gerth* (1944) 65 Cal.App.2d 170, 178-179 [150 P.2d 489]; accord *Cowles* v. *Carter* (1981) 115 Cal.App.3d 350, 355 [171 Cal.Rptr. 269].)[6] Thus probable cause has both an objective and a subjective element. (*White* v. *Brinkman* (1937) 23 Cal.App.2d 307, 312 [73 P.2d 254].) As the Restatement observes in the context of the malicious instigation of criminal proceedings, a "private prosecutor can not have probable cause for initiating criminal proceedings against another if he does not believe that the accused was guilty of the crime charged against him. If he does not so believe, it is immaterial that the facts of which he had knowledge or belief were such that reasonable

---

[6]Under the Restatement test, an initiator "of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and [¶] (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or [¶] (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information." (Rest.2d Torts, § 675, pp. 457-458.)

men might have regarded them as proof of the guilt of the accused. It is only when the prosecutor honestly but mistakenly believes the accused to be guilty that the question whether his belief was based on reasonable grounds becomes material." (Rest.2d Torts, § 662, com. c, p. 424.) That same rule obtains in California for the malicious prosecution of civil proceedings. "The existence of probable cause is, in part, determined by an objective test—it is '"a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true."' . . . But if the initiator knows that his claim is groundless he cannot have an actual or honest belief in its validity, and he may not escape liability for commencing an action based on such a claim merely because a reasonable man might have believed it was meritorious." (*Bertero* v. *National General Corp.*, *supra*, 13 Cal.3d at p. 55.)

The first issue confronting us is whether the reasonableness of the de,fendant's investigation of the facts and research of the law in this case constitutes a triable issue of fact for a jury or whether it is a question of law to be resolved by the court. Dr. Williams contends that the question of probable cause to file a medical malpractice action is a question of fact to be resolved by a jury. This contention misapprehends the function of the court in malicious prosecution actions and ignores nearly a century of precedent in this state.

The general rule is "[t]he trier of fact must resolve any conflict in the evidentiary underpinning of the facts of probable cause. Once that conflict has been resolved, the question of whether the facts as they are found to exist constitute probable cause for bringing the former action is a question of law to be resolved by the judge." (*Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675, 682 [120 Cal.Rptr. 291].) The linchpin of the Dr. Williams' argument is that even if there is no dispute over what facts the defendant knew or what efforts he made to research their actionability, it is still a question for the jury whether these efforts were reasonable. This position has superficial support in *Weaver* v. *Superior Court* (1979) 95 Cal.App.3d 166 [156 Cal.Rptr. 745]. "While probable cause is finally an issue of law, the question of whether given conduct is reasonable is always one of fact." (*Weaver*, 95 Cal.App.3d at p. 189.) "What is reasonable and what is unreasonable in terms of the attorney's prefiling investigation is a question of fact; the legal determination of probable cause or the lack of it arises from whatever is found on the factual issues." (*Id.*, at p. 192.) Since probable cause has a component of reasonableness, the *Weaver* court appears to parse off that part and leave it to be determined by the jury. But reasonableness is an integral part of the concept of probable cause and its ascertainment must be made by the one assigned the duty of determining probable cause. As we shall demonstrate, that duty,

for reasons of public policy, has been assigned to the court. To the extent that *Weaver* holds otherwise, it is nonviable mutation.

The rules relating to the determination of probable cause in malicious prosecution cases were recited nearly a century ago in the leading case of *Ball* v. *Rawles* (1892) 93 Cal. 222 [28 P. 937]. The *Ball* court noted that from the time of Elizabeth I, it was for a court to determine the presence of probable cause, an allocation of duty which rested on the public policy encouraging the exposure of crime. (*Id.*, at pp. 228-230.) "Malice is always a question of fact for the jury, but whether the defendant had or had not probable cause for instituting the prosecution is always a matter of law to be determined by the court. If the facts upon which the defendant acted are undisputed, the court, according as it shall be the opinion that they constituted probable cause or not, either will order a nonsuit (or direct a verdict for the defendant), or it will submit the other issues to the jury; but whether admitted or disputed, the question is still one of law to be determined by the court from the facts established in the case. If the facts are controverted, they must be passed upon by the jury before the court can determine the issue of probable cause; but the question of probable cause can never be left to the determination of the jury." (*Id.*, at p. 227; accord *Tool Research, supra,* 46 Cal.App.3d at p. 682; *Kassan* v. *Bledsoe, supra,* 252 Cal.App.2d at pp. 815-817; *Masterson* v. *Pig'n Whistle Corp.* (1958) 161 Cal.App.2d 323, 336-337 [326 P.2d 918]; *Murdock* v. *Gerth* (1944) 65 Cal.App.2d 170, 179-180 [150 P.2d 489]; Rest.2d Torts, §§ 681B, com. a; 673, com. e.)

The policy issue relates to who will set the legal standard for malicious prosecution. As the high court explained in *Ball,* "[i]t is for the best interests of society that those who offend against the laws shall be promptly punished, and that any citizen who has good reason to believe that the law has been violated shall have the right to cause the arrest of the offender. For the purpose of protecting him in so doing, it is the established rule, that if he have reasonable grounds for his belief, and act thereon in good faith in causing the arrest, he shall not be subjected to damages merely because the accused is not convicted. This rule is founded upon grounds of public policy, in order to encourage the exposure of crime, and when the acts of the citizen in making such exposure are challenged as not being within the reason of the rule, the court, as in every other case involving considerations of public policy, must itself determine the question as a matter of law, and not leave it to the arbitrament of a jury." (*Id.*, at pp. 228-229.) Although the elements of an action for malicious prosecution of a civil action are similar to those for a criminal prosecution, they are not identical. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 51, fn. 1.) Nevertheless, analogous considerations of public policy favor the protection of civil litigants who, in good faith and with tenable claims, seek

to resolve their disputes in courts of law. The rules relating to the function of the court on the issue of probable cause are, therefore, the same in both types of malicious prosecutions. (*Franzen* v. *Shenk* (1923) 192 Cal. 572, 576-577 [221 P. 932]; *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at pp. 682-683; see also Rest. Torts, § 681B, com. a, p. 473.) The question then is not whether the reasonableness of undisputed conduct can be described as a "fact"; it is rather who should measure the challenged conduct and thus set the legal standard for malicious prosecution actions. As Prosser noted in a similiar context, "[i]t is said also that the court must decide questions of law, and the jury questions of fact. But this means little or nothing until some method of classification is provided, by which 'law' may be distinguished from 'fact;' and the division of functions between the court and jury is a matter rather of historical origins and present policy than of any such definitions." (Prosser, Torts (4th ed. 1971) § 37, p. 205.) That division of functions in malicious prosecution cases was made by the *Ball* court for reasons of public policy and the task assigned to the court. The fact that the *Weaver* court ignores this binding precedent wholly undercuts the persuasiveness of its ruling. (See 4 Levy et al., Cal. Torts (1985) Malicious Prosecution, § 43.05[2][b], p. 43-45.) In sum, courts and not juries set the legal standard for malicious prosecution by determining whether the conduct at issue measures up to probable cause. Thus probable cause is not a label to be affixed by the court to the jury's finding that the defendant acted reasonably in bringing the lawsuit. It is rather a judicial determination that the defendant acted reasonably and in good faith as a matter of law. And, like all matters determined to involve questions of law, it must be made by the court. (Evid. Code, § 310, subd. (a).)[7]

 There is no dispute here about what defendant did or didn't do, or about what he knew or didn't know. Since the material facts relating to defendant's factual investigation and legal research are undisputed, the

---

[7]The Restatement adopts the same procedural dichotomy. "The respective functions of court and jury in actions for malicious prosecution differ in one important particular from their respective functions in other actions of tort in which, as in actions for negligence, the liability of the defendant depends upon the unreasonable character of his conduct. In passing on this question someone must determine what the defendant did or failed to do and the circumstances under which his act or omission occurred; and someone, either court or jury, must determine whether, in the light of these circumstances, his conduct measured up to the standard of a reasonable man. In actions for negligence and other tort actions in which the liability of a defendant depends upon the unreasonable character of his conduct, both of these matters are determined by the jury . . . . [¶] In actions for malicious prosecution, however, upon the issues of favorable termination and probable cause, the jury has only the function of finding the circumstances under which the defendant acted. The court determines whether, under those circumstances, the termination was sufficiently favorable to the accused, and whether the defendant had or had not probable cause." (Rest.2d Torts, § 673, com. e; see also *op. cit. supra*, § 674, com. h.)

question of whether those facts, including their reasonableness, gave rise to probable cause was a legal one for the court. In short, the "[r]esolution of the question of the existence of a triable issue of fact on the question of probable cause requires the isolation of the factual and legal elements of probable cause itself." (*Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at p. 682.) The reasonableness of defendant's investigation and research constitutes part of the legal element of probable cause and consequently tenders a legal issue for the court.

■ In making this judicial determination of probable cause defendant contends that the declarations of Dr. Williams' expert witnesses are not admissible. This is so, he argues, because the legal part of probable cause presents a question of law which is not subject to resolution by the declarations or affidavits of experts. (See *Carroll* v. *Kalar* (1976) 112 Ariz. 595, 599 [545 P.2d 411, 415].) We agree. "[I]t is thoroughly established that experts may not give opinions on matters which are essentially within the province of the court to decide." (*Carter* v. *City of Los Angeles* (1945) 67 Cal.App.2d 524, 528 [154 P.2d 907], citation omitted.) Consequently, the "opinion of a witness on a question of law is obviously incompetent." (31 Cal.Jur.3d, Evidence, § 530, p. 733, fn. omitted; see also, Evid. Code, § 801, subd. (b).) The declarations permitted under the summary judgment statute are required to "set forth admissible evidence . . . ." (Code Civ. Proc., § 437c, subd. (d).) To the extent that the declarations filed by Dr. Williams expressed an opinion on the legal question of probable cause, they were inadmissible as improper expert opinion. And to that extent, we shall disregard them.

The next question is by what standard the requirement of probable cause should be measured when the court assesses the conduct of an attorney rather than a litigant. Defendant apparently would have us borrow the standard for a frivolous appeal (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650-651 [183 Cal.Rptr. 508, 646 P.2d 179]), so that an underlying action would be filed without probable cause only when no reasonable attorney would have believed the case had merit. (Cf. Code Civ. Proc., § 128.5, subd. (b)(2).) We think this is too strict a standard. It was formulated for a "sparingly applied" *sanction* (*id.,* at p. 649), and not to restrict a cause of action. That malicious prosecution is sometimes said to be not "favored by the law" is no reason to defeat a plaintiff's established rights by indirection through the invention of new limitations. (*Bertero, supra,* 13 Cal.3d at p. 53.) A *Flaherty* standard would preclude recovery except where the suit was wholly irrational and incomprehensible. ■ ■ ■ ■ Such is not the function of the tort, which seeks to recompense a plaintiff for the harm done by one who acts without probable cause and with

malice.[8] Consequently, "want of probable cause does not mean the want of any cause, but the want of any reasonable cause, such as would persuade a man of ordinary care and prudence to believe in the truth of the charge." (*White* v. *Brinkman* (1937) 23 Cal.App.2d 307, 312 [73 P.2d 254].)

We are mindful of the public policies favoring free access to the courts and vigorous representation by one's counsel. However, "the public policy involved has properly served, over many years, to crystallize the limitations on the tort, and the defenses available to the defendant. Having served that purpose, it should not be pressed further to the extreme of practical nullification of the tort and consequent defeat of the other important policy which underlies it of protecting the individual from the damage caused by unjustifiable" suits. (*Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 159-160 [114 P.2d 335, 135 A.L.R. 775].)

We conclude that the objective standard of probable cause should be measured by whether a prudent attorney, after such investigation of the facts and research of the law as the circumstances reasonably warrant, would have considered the action to be tenable on the theory advanced. "An attorney has probable cause to represent a client in litigation when, after a reasonable investigation and industrious search of legal authority, he has an honest belief that his client's claim is tenable in the forum in which it is to be tried. . . . The test is twofold. The attorney must entertain a subjective belief . . . that the claim merits litigation and that belief must satisfy an objective standard." (*Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at p. 683.) To meet the objective standard, the attorney must not prosecute "a claim which a reasonable lawyer would not regard as tenable or by unreasonably neglecting to investigate the facts and law in making his determination to proceed, . . . ." (*Id.,* at p. 683.)

We emphasize that probable cause is not the same as legal cause; "otherwise, every plaintiff who loses a case would be liable in an action for malicious institution." (*Lucchesi* v. *Giannini & Uniack, supra,* 158 Cal.App.3d at p. 785.) This is especially true in the case of counsel for the losing plaintiff. The question is not whether counsel was "correct in believing that the court would sustain the claim, but whether his opinion that there was a sound chance that the claim might be sustained was a reasonable

---

[8]In this context, malice "is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted primarily for an improper purpose." (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 383 [295 P.2d 405]; see also Rest.2d Torts, § 676.) "Malice may be inferred from want of probable cause, but want of probable cause cannot be inferred from malice, but must be affirmatively shown by the plaintiff." (*Potter* v. *Seale, supra,* 8 Cal. at p. 220.) This is so because even "though malice is inferred from want of probable cause, still where probable cause does exist, malice, even affirmatively shown, will not entitle the plaintiff to a verdict." (*Lacey* v. *Porter* (1894) 103 Cal. 597, 607 [37 P. 635].)

one. To hold that the person initiating civil proceedings is liable unless the claim proves to be valid, would throw an undesirable burden upon those who by advancing claims not heretofore recognized nevertheless aid in making the law consistent with changing conditions and changing opinions. There are many instances in which a line of authority has been modified or rejected. To subject those who challenge this authority to liability for wrongful use of civil proceedings might prove a deterrent to the overturning of archaic decisions." (Rest.2d Torts, Wrongful Civil Proceedings, § 675, com. f, p. 460.) Thus an attorney is not an insurer that his client will prevail in the litigation. His duty is only to refrain from prosecuting unsound and untenable claims. (*Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at p. 683.) We do not think it places an attorney in a double bind to insist that while aggressively protecting his client, he conform to this standard of tenability. The use of this standard in malicious prosecution is particularly apt because the tort fills the gap left in legal malpractice actions with respect to adverse third parties, who cannot sue in negligence because no duty is owed them by the adverse attorney. (*Norton* v. *Hines* (1975) 49 Cal.App.3d 917, 921 [123 Cal.Rptr. 237].)

We now apply that standard to this case. Defendant's declaration that he honestly believed his client's claim against Dr. Williams was tenable stands uncontradicted. Thus he has established the subjective element of probable cause and there is no triable issue of fact concerning that element.[9] As we have noted, the facts concerning his investigation of the circumstances of Mrs. Bube's death and the law relating to malpractice are also substantially without conflict. Since there is no dispute concerning the existence of the facts relied on to establish probable cause, the question of whether those facts objectively amount to probable cause is a question of law for the court. And since it is a question of law, the trial court's resolution of the issue is not binding on us. (*Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 362.) ▉ We turn then to the uncontroverted facts which were before the trial court on the motion for summary judgment.

Unlike the thorough investigations of facts and law by the defendant attorneys in *Tool Research & Engineering,* in *Kassan,* and in *Murdock* v. *Gerth, supra,* 65 Cal.App.2d at pages 178-179, the defendant in this case relied on the allegations of his client with no further background investigation. He researched a single section of the California Administrative Code, finding no cases precluding a claim for negligence per se (nor any

---

[9]Code of Civil Procedure section 437c, subdivision (e) permits the trial court, in its discretion, to deny a motion for summary judgment "where a material fact is an individual's state of mind, or lack thereof, and such fact is sought to be established solely by the individual's affirmation thereof." Since the trial court granted the summary judgment in this case, we have no occasion to further consider that subdivision.

cases *authorizing* one). Finally, he sought the opinion of one physician, with respect to whom the defendant cannot recall giving anything other than an oral characterization of the case on a social occasion. Based solely on these activities, he claims his evidence supports a motion for summary judgment in his favor because they demonstrate probable cause as a matter of law.

To the contrary, this evidence establishes a *lack* of probable cause. The adequacy of the defendant's factual investigations prior to filing leave a great deal to be desired. Without as much as one confirmatory interview with hospital personnel, he filed a suit against Dr. Williams based solely on his client's word. We do not say that an attorney must doubt what his client tells him, but there was not a shred of support for the client's statements about Dr. Williams in the documents she provided. In an area of the law as complicated as medical malpractice, an attorney acts at his peril in accepting his client's uncorroborated version of the medical facts.[10] No claim is made 'that this was a situation where the defendant was rushing to beat the statute of limitations and did not have time to substantiate his client's claim.[11] Without an adequate investigation of the facts, defendant took the risk that his client's hearsay version of Mrs. Bube's admission and ward placement was correct.

Fortuitously for the defendant, however, Dr. Williams was indeed the doctor who decreed standard admission procedures. While, as we have noted in the margin, this belatedly obtained information is immaterial to the issue of probable cause at the time of filing the lawsuit, it would nevertheless preclude Dr. Williams from claiming damages of any sort on that basis. Since damages are an essential element of the tort, he could not premise his action on his premature inclusion in the complaint. (*D'Alessandro* v. *Pickford* (1937) 22 Cal.App.2d 239, 242 [70 P.2d 646]; see *Harbor Insurance,*

---

[10]In the absence of any supporting evidence, the defendant and his client would be ignorant of the facts giving rise to a cause of action against any particular physician and could name the doctor as a "Doe" under Code of Civil Procedure section 474, until they connected him with the death. *Dover* v. *Sadowinski* (1983) 147 Cal.App.3d 113 [194 Cal.Rptr. 866], cited by the defendant as an excuse for naming Dr. Williams in the original complaint, is inapposite; in *Dover,* the name of the defendant doctor appeared in the medical records. (*Id.,* at pp. 116-117.)

[11]It is true, as the Restatement notes, that in "many cases civil proceedings, to be effective, must be begun before all of the relevant facts can be ascertained to a reasonable degree of certainty." (Rest.2d Torts, § 675, p. 459.) But is it not certainty that is required, only tenability. Moreover, in an action against a physician for professional negligence, plaintiff's attorney is required to file a certificate declaring (if the other statutory alternatives do not apply) that he has reviewed the facts of the case, has consulted with a physician believed to be knowledgeable in the relevant issues involved in the particular action and has concluded "on the basis of such review and consultation that there is reasonable and meritorious cause for the filing of such action." (Code Civ. Proc., § 411.30, subds. (a), (b)(1).) Defendant Coombs filed such a certificate in the malpractice action against Dr. Williams.

*supra,* 165 Cal.App.3d at p. 1036; *Rutherford* v. *Johnson* (1967) 250 Cal.App.2d 316, 319-320 [58 Cal.Rptr. 546].)

The quality of the defendant's legal research cannot be similarly rescued. He contends a reasonable attorney could presume that Dr. Williams was liable on a negligence per se theory because section 70577 was violated and there is no authority precluding such liability. The initial error with this theory is the language of the regulation: "The psychiatric unit shall be used for patients *with the diagnosis of a mental disorder . . . .*" (Italics added.) Mrs. Bube was admitted under Welfare and Institutions Code section 5150 (which is not itself a diagnosis of a mental disorder) and so far as the record shows was never diagnosed by any staff physician or other hospital personnel as being mentally disordered. Thus, the predicate for the regulation never came into play.

Putting aside this fundamental problem, defendant cannot simply pluck a regulation from thin air and claim it governs the conduct of a physician. Obviously, not every violation of a statute or administrative regulation gives rise to a presumption of negligence. The common law presumption of negligence has been codified in Evidence Code section 669. Subdivision (a) of that section provides: "The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class or persons for whose protection the statute, ordinance, or regulation was adopted." Examining the context of section 70577, and given the facts presented on the summary judgment motion, it cannot be said that Dr. Williams' conduct gave rise to a presumption of negligence under Evidence Code section 669.

Division 5 of title 22 of the California Administrative Code relates to the licensing and certification of health *facilities* and referral *agencies.* Chapter 1 of this division regulates general acute care *hospitals,* which is one of four types of hospital licenses. (§ 70042.) In order for the general acute care hospital to operate, it requires a license (§ 70103), and in order to obtain the license, it must provide certain basic services. (§ 70011.) Articles 1 to 3 of this chapter contain general definitions (§§ 70001-70069), provide for licensing procedures and inspections (§§ 70101-70137), and set the standards for the basic services. (§§ 70211-70279.) Articles 4 and 5 provide that the hospital obtain prior approval for any service supplementary to the basic services and get a special permit for certain of these supplementary services (including a psychiatric unit). (§§ 70301, 70351.) At last we come

to the provision on which the defendant would rely, which is contained in article 6 prescribing standards for these supplementary services. (§§ 70401-70657.) Preceding section 70577 we find section 70575, which states: "A psychiatric unit means a service . . . *of a hospital* which is organized . . . to provide . . . care for mentally disordered or other patients referred to in [Welfare & Institutions Code § 5000 *et seq.* and § 6000 *et seq.*]." (Italics added.) There is not the slightest indication in this scheme that these regulations are to apply to any entity other than a hospital. It cannot plausibly be argued, for example, that if Siskiyou General Hospital, in violation of the regulation, did not have a "psychiatric unit," then a physician would be presumptively negligent by admitting a mentally disturbed patient to some other ward of the hospital. In short, the regulation imposes duties upon hospitals and not on individual doctors. Thus, not only does this research fail to meet the standards of a reasonable attorney, a plausible argument could be made that *no* reasonable attorney would believe that negligence per se could be premised solely on an individual physician's "violation" of this regulation.

It may well be the case that there was a tenable theory which could have been advanced by defendant in support of his client's claim against Dr. Williams. For example, a theory of res ipsa loquitur might have been explored. After all, Mrs. Bube was brought to the hospital in a suicidal state to prevent the very thing that was permitted to happen: her suicide. One need not be an expert to know that suicidal persons tend to commit suicide and that precautions must therefore be taken. From the very fact of her suicide under these circumstances an inference of negligence on the part of those in charge of her care might have been drawn. "If those charged with the care and treatment of a mentally disturbed patient know of facts from which they could reasonably conclude that the patient would be likely to harm himself in the absence of preclusive measures, then they must use reasonable care under the circumstances to prevent such harm." (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 424 [71 Cal.Rptr. 903, 445 P.2d 519].) In *Meier,* the decedent had attempted suicide and had been placed in the hospital because of his depressed state and physical injuries. He then committed suicide by jumping headfirst through an open window of his second floor room. A wrongful death action was brought against the hospital and the attending physician. On plaintiff's appeal from an adverse jury verdict, the Supreme Court held that the trial court improperly rejected plaintiff's proposed instruction that he could rely on the doctrine of res ipsa loquitur even though the decedent "participated in events leading to the accident if the evidence excludes his conduct as the responsible cause." (*Id.,* at p. 427.) The court ruled that a plaintiff is entitled to a conditional res ipsa loquitur instruction "whenever the facts of a case support a theory

of liability based on a duty to protect plaintiff . . . from his own actions, voluntary or involuntary." (*Id.*, at p. 427.)

It might also be the case that, with proper investigation and consultation with medical experts, a tenable claim could have been made that Dr. Williams simply committed malpractice. A physician who advises that a suicidal patient be placed in an unattended room without any special precautions might be deemed by some reputable medical authorities to have acted below the requisite standard of care. (See generally, Annot., Liability of Doctor, Psychiatrist, or Psychologist for Failure to Take Steps to Prevent Patient's Suicide (1982) 17 A.L.R.4th 1128.) But neither these nor any other plausible theories were ever researched, investigated or advanced by defendant.

The test in a malicious prosecution action is not whether defendant had reasonable grounds to seek some kind of relief in the original action; it is instead whether he had reasonable grounds for asserting the theory for relief contained in the complaint and tried to the factfinder. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 57.) "A plaintiff acting in good faith may safely sue on alternative theories . . . when he possesses a reasonable belief in the validity of *each* of those theories." (*Ibid.*, italics in original.) Indeed, even if the pleading originally advanced a tenable theory but subsequent research or discovery proves it to be untenable, the pleading should be amended to change or delete it. (*Ibid.*) In short, plaintiffs and their counsel cannot safely proceed on "theories which they know or should know to be groundless." (*Ibid.;* fn. omitted.)[12] Thus counsel for an unsuccessful plaintiff cannot shield himself from a malicious prosecution action by arguing that even if the only theory advanced in the complaint and at trial was groundless and maliciously asserted, he nonetheless possessed some other undisclosed and unlitigated, but tenable, theory. He must stand or fall on the theory advanced and if that theory is one which he knows, or should know, is groundless and he nevertheless maliciously advances it, he must fall. The only theory tendered in this case was the groundless one that Dr. Williams violated an inapplicable section of the administrative code and that this violation constituted negligence per se. The trial court therefore erred in holding that defendant, on the facts presented on the motion for summary judgment, had probable cause as a matter of law to file the suit against plaintiff and proceed to trial on this theory. The summary judgment on the first cause of action must be reversed.

## II

We need not tarry long on Dr. Williams' second cause of action for intentional infliction of emotional distress. There he realleged all of the

---

[12]It follows from this "that an action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . ." (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 57, fn. 5.)

allegations of the malicious prosecution cause of action. To those he added the allegation that "[s]aid conduct of defendants, and each of them, constitutes a continuing campaign of intimidation, harassment, and coercion against plaintiff, conceived and calculated to cause plaintiff to settle said action, to incur substantial costs and legal fees in defending the actions, to suffer the fear, humiliation and embarrassment associated with being named a defendant in a complaint seeking damages for medical negligence." Thus the intentional act pled in the second cause of action as inflicting the emotional distress, the "said conduct," was the filing and maintenance of a suit falsely stating that Dr. Williams committed medical malpractice. Civil Code section 47, subdivision 2, provides an absolute privilege for a publication in any judicial proceedings.[13] Neither actual malice or falsehood will defeat the privilege so long as the statement has any reasonable connection with a legal action and is made in furtherance of the litigation. The purpose of the privilege is to secure utmost freedom of access to the courts without fear of retribution. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 380-381 [295 P.2d 405]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 488-489 [104 Cal.Rptr. 650]; *Smith* v. *Hatch* (1969) 271 Cal.App.2d 39, 45-46 [76 Cal.Rptr. 350].)

The filing a lawsuit is a publication in the course of a judicial proceeding. (See *Albertson* v. *Raboff, supra,* 46 Cal.2d at pp. 379-380.) Thus, "the filing of a complaint or petition is in itself a publication which is privileged because it is required by law to initiate the judicial proceeding." (*Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832, 841 [184 Cal.Rptr. 317, 30 A.L.R.4th 561]; see also 4 Levy et al., Cal. Torts, *supra,* Defamation, § 45.11 [4][c], p. 45-52.) Consequently, "although the statutory privilege accorded to statements made in judicial proceedings appears in the code in the chapter on defamation, it applies to virtually all other causes of action, with the exception of an action for malicious prosecution. Thus, the privilege will defeat claims for invasion of privacy and intentional infliction of emotional distress." (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637]; citations omitted.) The sole conduct asserted here was making the statement that Dr. Williams committed medial malpractice and that statement was made only in a judicial proceeding. This statement, whether true or false, constituted a privileged publication. As we explained in *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386 [182 Cal.Rptr. 438], case law has "applied the privilege to defeat tort actions which, however labeled and whatever the theory of

---

[13]Civil Code section 47, subdivision 2 provides in relevant part: "A privileged publication or broadcast is one made—. . . [¶] 2. In any . . . judicial. . . ."

liability, are predicated upon the publication in protected proceedings of an injurious falsehood." (*Id.*, at pp. 390-391, fns. omitted; see also *Rosenthal v. Irell & Manella* (1982) 135 Cal.App.3d 121, 125-126 [185 Cal.Rptr. 92].) This cause cannot be maintained in light of the privilege and the summary judgment on this cause must be affirmed.[14]

### DISPOSITION

The summary judgment in favor of the defendant on the first cause of action is reversed. The summary judgment in favor of the defendant on the second cause of action is affirmed. Both parties shall bear their own costs on appeal.

Regan, Acting P. J., and Blease, J., concurred.

A petition for a rehearing was denied April 28, 1986, and respondent's petition for review by the Supreme Court was denied July 9, 1986.

---

[14]Dr. Williams suffers no detriment from this affirmance because his malicious prosecution cause of action remains and his damages, should he prevail, are essentially the same as those recoverable in an action for intentional infliction of emotional distress. "In recognition of the wrong done the viction of such tort [of malicious prosecution], settled law permits him to recover the cost of defending the prior action including reasonable attorney's fees, compensation for injury to his reputation or impairment of his social and business standing in the community, and for mental or emotional distress." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d at p. 51, citations omitted.)